J. B. PETRUS, SR., et al., appellants, v. CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, appellee.

No. 48170.

(Reported in 61 N.W.2d 439)

DECEMBER 15, 1953.

Don H. Jackson, Proctor R. Perkins, and Peterson, Smith, Peterson, Beckman & Willson, all of Council Bluffs, for appellants.

Ross, Johnson, Northrop & Stuart, of Council Bluffs, and R. L. Read and A. B. Howland, both of Des Moines, for appellee.

WENNERSTRUM, J.—Plaintiffs in their action in the district court sought to have quieted title to a strip of land which is adjacent to other land owned by them. This strip is approxi-

mately 25 feet in width and 700 feet in length. Plaintiffs had enclosed the land in controversy by a fence and pleaded in their petition title to this particular property had been acquired by them by virtue of acquiescence on the part of the defendant and adverse possession for more than ten years by plaintiffs. The defendant asserted the use and possession of the land involved in this litigation was permissive only and that plaintiffs were only tenants at will. The trial court found in favor of the defendant and ordered a writ of possession in favor of it. The plaintiffs have appealed.

Sometime during the year 1931 J. B. Petrus, Sr., one of the plaintiffs herein, purchased a number of lots in the city of Council Bluffs, Iowa, a portion of these lots being adjacent to the defendant's right-of-way. On April 18, 1939 J. B. Petrus, Sr., acquired title to all the remaining lots in the addition in which his original purchase had been made. After the initial property was acquired a corporation was formed which carried on business under the name of the Midwest Walnut Company and was engaged in the processing of walnut lumber and veneers. This corporation continued until December 31, 1936, from which time J. B. Petrus, Sr., operated the business until a partnership was formed on or about June 30, 1943.

The defendant's right-of-way adjoins plaintiffs' property to the west and was acquired by deed in 1868 by a predecessor of the defendant-company. The property claimed by the plaintiffs is located between the land originally purchased by Petrus and the defendant's railway line. It is maintained by the railroad to be a part of its right-of-way. It is plaintiffs' contention the land in controversy has been entirely enclosed by a wire fence which also encloses all of the other land and buildings owned and used by them.

Prior to 1935 the plaintiffs or some of them stored lumber on a portion of the land now in controversy but at that time no claim of ownership was made to the property then so used. On or about April 20, 1935, J. B. Petrus, Sr., commenced the construction of a fence on a line approximately 25 feet inside the land claimed by the defendant railroad company as its right-of-way. When the erection of this fence was commenced there was

correspondence between a representative of the railroad company and one or more of the plaintiffs. On May 2, 1935, the local agent for the railroad company wrote a letter to the Midwest Walnut Company, the name under which the corporation was then operating. It is in part as follows:

"For your information, our right-of-way extends 50 feet from the center of the main line, both ways, north and south, and any fence that is put in will have to be not closer than this line, and if you are using any of the property inside of that, it will be necessary to arrange for lease. I am informed by Mr. Leslie that a few posts have already been set which are within the line and if such is the case it will be necessary that they be removed."

On May 7, 1935, the local agent also wrote a letter to the division superintendent of the railroad company which is in part as follows:

"The Midwest Walnut Company are [is] operating a yard on South Avenue on property leased from the Children Manufacturing Company's Estate and they would like to use part of our right-of-way alongside of their yard and put up a fence. The fence would be 25 feet from our north right-of-way line and about the same distance from the center of our main line and would give good clearance on our passing track.

"I am attaching herewith a rough sketch showing about what they would like to have and would ask if this can be arranged and if so, at what rental."

Later in the year 1935 the local agent who had written the previously referred to letters died and thereafter no further letters were written by representatives of the company until the present controversy developed.

In 1939 the Midwest Walnut Company's plant was damaged by reason of the flooding of it by surface water. It was then claimed the defendant railroad company and the Chicago, Milwaukee, St. Paul & Pacific Railway Company were responsible because of the filling up of drains and the resulting inability of the water to drain rapidly from their properties including the land here involved. An action was brought by Mr. Petrus, Sr., against the two railroads and these suits were settled in 1940 by

the payment of $2250, one half of which was paid by each of the two railroad companies. It was claimed lumber was damaged by flood waters and this lumber was stored within the area then or later fenced.

During the month of September 1939 a representative of the plaintiffs wrote a letter to the defendant-company in which complaint was made concerning the fact that employees of the defendant railroad company had failed to keep the gates across the tracks locked upon leaving the property. This letter is in part as follows:

"As you know, we recently put a fence around our property and in doing this put two gates across the railroad switch tracks. This was done with your permission, and an arrangement was made whereby you were to have a lock on each of these gates, and you were to have a switch lock which would enable either of us to open the gates."

During the latter part of the year 1940 or the early part of the year 1941 the plaintiffs erected a drying kiln entirely on their own property. At this time they also installed a short length of track at right angles to the railroad tracks on the property in controversy. It was constructed to make possible the movement of trucks or conveyances to handle lumber taken from railroad cars and which plaintiffs might wish to be stored in the drying kilns. This track was constructed on a portion of the 25-foot strip of land heretofore mentioned. It is the plaintiffs' claim they have had possession of the property within the area fenced since the fence was erected in 1939 but have permitted the defendant-company and switch crews to have access to the property here involved in order to serve the plaintiffs' plant as well as other industries located on this particular switch track.

During April 1951 the defendant railroad company commenced preliminary surveys for the construction of a new switchyard which was to be located on its property adjacent to land in the addition previously purchased by the plaintiffs or their predecessors. The purpose of the construction of the new switchtrack yard was to enable the defendant-company to assemble and service long freight trains. When this proposed construction survey and the contemplated changing of the tracks were

brought to the attention of the plaintiffs, one of their representatives wrote a letter dated April 16, 1951, to the defendant-company which is in part as follows:

"We are informed that you contemplate making a switch-track extension in Council Bluffs which will apparently chop off quite a bit of ground we have been using and, from what information we have, will block off our dry kilns as well as chop off a 150′ storage shed we have here. If this is true, it is quite apparent that this move by the Rock Island will cause us a very substantial financial loss, therefore we wonder if you can have one of your surveyors come out and show us where the line will be. This is very important to us, as we must make our plans accordingly."

In connection with the developing controversy between the plaintiffs and the defendant-company there were several conferences held by representatives of the railroad company and the plaintiffs or some of them. In a preliminary conference in Council Bluffs no claim of ownership was made by Mr. Petrus, Sr., or a Mr. Combs, who had written the last letter heretofore set forth. On a later date a further conference was held by J. B. Petrus, Sr., and his son, J. B. Petrus, Jr., at which time Mr. Petrus, Sr., suggested that he desired to meet with the president of the railroad company. A meeting in Chicago was arranged and held on May 7, 1951, when Mr. Petrus, Sr., conferred with one of the vice-presidents, the chief engineer and other representatives of the railroad company. There is some controversy concerning what was said between the various individuals present but there seems to be an agreement that Mr. Petrus, Sr., made no claim he held title to the 25-foot strip which is now in controversy. In fact, Mr. Petrus, Sr., in his cross-examination, testified in part relative to the Chicago conference as follows:

"I do not recall any discussion about the terms and conditions under which I had been occupying a part of railroad ground. I did not make any statement that I claimed to own any part of land located in the westerly side of the line claimed by the railroad. I didn't say anything about the possibilities of litigation to anyone present. I did say that I would like to make an arrangement whereby I could continue to use the prop-

erty. I suggested they could extend the yard to the southeast which would not interfere with me."

■ I. Acquiescence sufficient to establish a boundary line is a mutual recognition of a dividing line for ten years by adjoining landowners. Atkins v. Reagan, 244 Iowa 1387, 1390, 60 N.W. 2d 790, and cases cited; Concannon v. Blackman, 232 Iowa 722, 724, 6 N.W.2d 116, and cases cited.

Acquiescence to the establishment of a boundary line must be by both adjoining landowners. It involves notice or knowledge of the claim of the other party. Morley v. Murphy, 179 Iowa 853, 859, 162 N.W. 63; Dwight v. City of Des Moines, 174 Iowa 178, 183, 184, 156 N.W. 336. In connection with the question whether the railroad company ever had any notice of the present claim of the plaintiffs we find from the examination of J. B. Petrus, Sr., the following:

"Q. Do you recall anybody from the Rock Island Railroad ever telling you that you could construct a fence there or giving you permission to construct a fence? A. No. Q. Excluding a lease? A. No."

■ Mere acquiescence in the existence of a fence as a barrier and not as a boundary is not such recognition and acquiescence as will amount to an agreement as to the boundary or establish it as the true line. 11 C. J. S., Boundaries, section 79, page 653; O'Dell v. Hanson, 241 Iowa 657, 663, 42 N.W.2d 86; Eggers v. Mitchem, 239 Iowa 1211, 1216, 34 N.W.2d 603.

■ Acquiescence is usually proven by inference or presumption from the conduct of the parties. Dake v. Ward, 168 Iowa 118, 121, 150 N.W. 50. We do not find that there are any facts from which an inference or presumption of acquiescence can be found. Even though the area was fenced it is definitely shown plaintiffs gave the employees of the defendant-company keys for the gates, thus indicating some right to the property.

■ A review of the evidence does not disclose any circumstances which would indicate the defendant-company had notice of any claim of ownership by acquiescence on the part of the plaintiffs. Then, too, it should be kept in mind the fenced area included a switch track which served the plaintiffs and other industries.

 II. There is a distinction between acquiescence and adverse possession. Thompson v. Schappert, 229 Iowa 360, 363, 294 N.W. 580; Nichols v. Kirchner, 241 Iowa 99, 104, 40 N.W.2d 13. Adverse possession requires proof of hostile, actual, open, exclusive and continuous possession under claim of right or color of title for at least ten years. Nichols v. Kirchner, supra, and cases cited. It is very apparent to us there is not sufficient proof to show plaintiffs' claim was under a good faith claim of right or color of title. Likewise there is a lack of proof that plaintiffs' possession was open and notorious. At most, their possession was merely permissive. It should also be kept in mind the law presumes possession of realty is under regular title rather than by adverse possession. Meyers v. Canutt, 242 Iowa 692, 696, 46 N.W. 2d 72, 24 A.L.R.2d 1. In the case of Goulding v. Shonquist, 159 Iowa 647, 652, 141 N.W. 24, a circumstance considered in denying a claim of adverse possession was the fact that the claimant had never paid taxes on the land involved or had offered to do so. We have a similar situation in the present case.

We are convinced plaintiffs have failed in their proof to sustain their claim of adverse possession.

Upon a thorough review· of the record and the cited authorities we have concluded the trial court was correct in its decision. We therefore affirm.—Affirmed.

All JUSTICES concur.